ALICE A. JOSLIN *vs.* ELIJAH ASTLE, JR.

NOVEMBER 3, 1937.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

FLYNN, C. J. This is a bill in equity, brought by the owner of a one-half interest in certain real estate, to establish a trust *pro tanto* in certain leases and subleases of that real estate. The respondent is the named lessee in the leases and is the lessor in the subleases in question. The bill also seeks an accounting by the respondent, as trustee, of the rents and profits accruing under the interests and leases above mentioned for the period from and after June 19, 1920, and for general relief. After a hearing on bill, answer

and evidence in the superior court, a justice in equity granted the relief as prayed for and a final decree upon the merits was entered accordingly. The case is before us upon the respondent's appeal from this decree. A motion by the complainant to dismiss this appeal was previously heard and denied. *Joslin* v. *Astle, Jr.,* 56 R. I. 61.

The facts presented in evidence during the extended hearings in the superior court cover a long period of time and are rather complicated. Therefore only those facts which seem necessary to understand the issues, the contentions of the parties, the findings and the decree appealed from will be set forth briefly.

The complainant, Alice A. Joslin, is the older of two daughters of Thomas A. Lee and was, at the time of the hearing, eighty years of age. Her much younger sister, Fannie Lee Astle, is the wife of the respondent, Elijah Astle, Jr. Thomas A. Lee also had a son, Frank R. Lee, and the above-named persons comprised the Lee family during the period first in question. All of these children were married and lived separately from each other. The respondent and his wife made their home for years with the latter's father in the Lee homestead.

Thomas A. Lee, during his lifetime, was the owner of a large business building on Main street in the city of Pawtucket, commonly known and referred to in evidence as the Lee Block. These premises were mortgaged to the Swan Point Cemetery, Inc. in the aggregate amount of some $21,000. He also owned the family homestead and another dwelling, in which his son Frank lived, but the Lee Block constituted the bulk of his assets and he lived largely on the income therefrom. The transactions and leases in question here relate only to the Lee Block.

In 1901 the Lee Block was occupied by Radikin & Cooney, under a lease which yielded a net annual rental of $4550. While this lease had some seven or eight years yet to run, Thomas A. Lee signed an indenture of lease of the Lee Block,

dated March 23, 1901, wherein Elijah Astle, Jr., the respondent, was the named lessee. It provided a term of twenty-five years to begin at the termination of the Radikin & Cooney lease, and reserved a rent at the rate of $4550 per year, the lessee to pay the taxes, water rates and insurance and to keep the premises in good repair. This lease was not delivered immediately by the lessor. In fact, it was not delivered and recorded until July 8, 1908. The complainant at no time was informed by the respondent of the existence or recording of this lease, nor did she learn of it until just before this suit was begun, when informed of it by her attorney. This is the first lease in question here.

On May 12, 1910, a comparatively short time after the recording of this lease, Thomas A. Lee executed a will, in which he nominated the respondent Elijah Astle, Jr. as executor and, among other dispositions, devised the Lee Block in equal shares to the complainant and her sister, Fannie Lee Astle, wife of the respondent, as tenants in common. This devise, however, was made on conditions which subjected this property to certain charges to be paid by the devisees in favor of Frank R. Lee and his family. Among them were payment of $1000 annually to the son Frank R. Lee during his life; payment of the taxes, insurance and interest on a mortgage of $1500 on the High street house, devised to Frank, together with the necessary repairs thereto; $300 to be paid annually to each of Frank R. Lee's two children, extending over five years from and after the death of Frank R. Lee; and at the end of that period to pay an additional amount of $3000 to Anthony Lee and $5000 to Marie Lee, both children of Frank R. Lee, if they were then living. While mentioning in some detail the encumbrances upon Frank's house, and other obligations to be paid by the devisees of the Lee Block as charges on the latter property, the will significantly does not stipulate any encumbrance or obligation outstanding on the Lee Block by way of a lease thereof to the respondent.

Thomas A. Lee died October 16, 1915. After his death the terms of his will were made known at a family conference, at which the parties to this suit were present. At that time the respondent made no mention whatever concerning the lease of the Lee Block, which had then been recorded for several years and under which he was named as the lessee. The chief discussion and result of this meeting was an agreement whereby the respondent would manage the affairs of the Lee Block for the equal benefit of the complainant and her sister.

During October 1915, a short time after the reading of the will, the respondent and his wife again called upon the complainant at her home. The respondent then explained that, under the will, he was to look after and manage the property; that he wanted the complainant to trust him; that he was going to do the same for the complainant as for his own wife; that the complainant would receive a check monthly from the income of the Lee Block but that it would be necessary to set aside some part of the income for emergencies, repairs to the building, insurance, and the like, and also for the monthly payments to be made, according to the will, to and for the benefit of her brother Frank and his family. How the respondent figured the amount of the monthly checks then mentioned, namely $100, was not further explained. At that time the complainant was about sixty-one years of age and wholly inexperienced in business affairs; the respondent, on the other hand, then and at all times thereafter was a widely experienced and successful businessman.

The complainant, it appears, had been told substantially by her father, previous to his death, that he would leave the affairs of the Lee Block to be managed by the respondent for the equal benefit of the complainant and her sister and that she, the complainant, should rely upon the experienced judgment and follow the advice of the respondent in

such matters. Hence the complainant recognized, in the terms of the will and in the respondent's solicitation of her trust and confidence, the situation which had been previously explained to her by her father. She therefore was prepared to, and did, rely upon the representations and advice of the respondent and accepted the situation entirely as explained by him.

At no time during his solicitation of this trust or in his representation to her did the respondent make known any special interest which he personally might have had in the Lee Block, and particularly made no mention of any rights, or claims in his own right, to any lease of this property. No further explanation of the details of the income or management of the block was offered by the respondent nor asked by the complainant, who placed complete confidence and trust in him.

The will of Thomas A. Lee was then probated and the respondent was duly appointed and qualified as the executor thereof and proceeded to take full charge of all affairs. No monthly income checks were received by the complainant for October, November or December of 1915, which apparently was in keeping with the respondent's explanation that a certain reserve would be established for repairs, etc. Checks for $100 per month began in January 1916 and continued to be received by the complainant with some variations and more or less regularly. None of these checks were from the respondent individually. On the contrary all of them were drawn upon the estate of Thomas A. Lee, and were signed by the respondent as executor.

From the death of Thomas A. Lee, the respondent had assumed charge of all affairs and made the various payments to Frank R. Lee and for his benefit, which the complainant and her sister, Fannie Lee Astle, were directed by the will to pay. He also assumed charge of the payments for mortgage interest, taxes, insurance and repairs upon

Frank R. Lee's house on High street, as well as for similar payments on the Lee Block. No accounting of any kind was rendered to the complainant and none was requested because, according to the complainant, of her father's instructions and her trust in the respondent. At all times the respondent made the complainant understand by his representations that he was doing all of the work and taking care of the Lee Block for the equal benefit of the complainant and his own wife, without charging a cent for what he was doing.

Some two or three years after the father's death, a mild but significant disagreement took place between the complainant and respondent. He urged upon the complainant the necessity of installing a new heating plant in the Lee Block and asked her to contribute her proportionate share of the cost, explaining that his wife was willing to pay for her own share. The complainant declined for the reason, pointed out to the respondent, that she thought the reserve, which she believed was being established out of the monthly income according to his representations, would be sufficient to take care of such repairs. It is noteworthy that the respondent's conduct and representations in this connection are wholly inconsistent with his later claim of a lease in his own right, by the terms of which *he,* as lessee, would have been obligated to make such repairs. On the other hand, it is entirely consistent with the complainant's understanding and claim.

On October 31, 1919, the respondent subleased the entire Lee Block to Waldorf System, Inc., hereinafter referred to as Waldorf, for a term commencing November 1, 1919 and ending April 30, 1933. This sublease required Waldorf to pay to the respondent, as lessor, an annual rental of $8550 for the first five years and $9000 during the remainder of the term, and to pay all taxes, water rate, insurance and repairs. This is the first sublease in question here.

At the time of or shortly after its execution, negotiations were taking place between the respondent and Waldorf looking to an extension of this sublease at a greatly increased rental. With this knowledge, obtained by him while he was acting as a confidential agent of the complainant, the respondent, without disclosing it, explained to the complainant that he desired to be relieved of the duty of looking after the Lee Block. It apparently was represented by the respondent, and his wife who accompanied him, that his other work was being neglected; that he was not getting paid for this work in connection with the Lee Block; that Waldorf desired to lease the whole premises and such a lease would shift the burden of the work to Waldorf and leave only one tenant for the respondent to look after; that Waldorf would also pay for such a lease, if agreed to by complainant and her sister, a rental which would increase the annual rental income of the block by $1000, that is $500 each to the complainant and her sister, leaving it reasonably to be inferred from all of these representations that Waldorf did not then have such a lease although the respondent knew that it did; that the respondent would still continue to handle the necessary work and the checks of the Waldorf, without charging for the service, and that the complainant and her sister would receive what the Waldorf paid.

Everybody appeared to be on friendly terms at that time and the complainant was still relying upon and following the advice of the respondent as her confidential agent. She asked him specifically what he advised and he urged her to agree to the Waldorf lease. The complainant then said: "Elijah, if you think so, I do." Thereupon the respondent informed the complainant that he would have his own lawyer draw the necessary lease and come over to her home for her signature. It is significant that at no time during this conversation did the respondent or his wife mention to the complainant the existence of his original lease, or of his

first sublease to the Waldorf, or that he was negotiating for an extension of his sublease to Waldorf.

·On· June 19, 1920, shortly after this meeting, the respondent brought to the complainant what she understood, from his representations, was the lease directly to the Waldorf which they had previously discussed. The respondent's lawyer, who drew the extension to the lease, then arrived at the invitation of the respondent, and acted apparently as if he had been led to understand that everything was perfectly understood and agreeable to all parties, as a family affair would naturally be. He merely asked the complainant if she understood the document, and the complainant indicated that she did, believing that it was the lease directly to the Waldorf, as previously represented by the respondent. She testified that she signed the lease, without reading it or having its contents otherwise brought to her attention by anybody. This was disputed by the evidence for the respondent, but the trial justice found in favor of the complainant, and found that she was not, because of the unusual circumstances negligent in signing the extension without first knowing its contents.

It is significant that the attorney referred to was available as a witness but was not called by the respondent to contradict the testimony of the complainant and her daughter to the effect that the contents of the lease or extension were not read by or made known to the complainant before she signed it. The complainant at no time had independent legal advice and relied solely upon the respondent as her confidential business advisor. What she signed, however, ultimately turned out to be not a lease to the Waldorf, as represented by the respondent, but an extension of the respondent's own undisclosed lease for a further term of ten years from April 30, 1933 at an annual rental of $5550, which, however, was to become payable at once, notwithstanding the former lease had not expired.

Almost immediately after this extension was thus obtained, the respondent executed a sublease of these premises to the Waldorf, dated July 1, 1920, providing a corresponding extension to its original lease for ten years from and after April 30, 1933. It also increased the annual rental from $8550 and $9000 to $11,300. Under this extension lease, as under the original, Waldorf was obligated to pay for the taxes, insurance, water rates and repairs.

Matters then continued more or less as before, excepting for an increase of some $40 in the complainant's monthly checks, until the spring of 1933. During all of that period the actual amount collected by the respondent from the Waldorf under its leases, although very much larger than the respondent was paying over to the complainant and her sister, in accordance with his understanding with complainant, was never made known to or learned by her. Final account in the estate was not rendered or allowed until June 1931, and the respondent continued thereafter, as before, to transact business for the complainant as her confidential agent.

In the spring of 1933 the respondent informed the complainant that Waldorf insisted upon a decrease in the rental being paid under its lease and that she would have to take less rent. He did not tell her of his own lease or of his obligation thereunder to pay the specified rental regardless of the attitude of the Waldorf. The amount of the decrease, though requested by complainant, was not then made known; but some time later, after several visits, the respondent informed her that he thought Waldorf would pay about $3600 annually. Still later the respondent informed the complainant that Waldorf was then paying $5000, whereas actually it was paying some $7200 under a written contract whereby a reduction was granted by the respondent. No favorable action having been obtained from the complainant, the respondent later informed her that the most Waldorf would pay would give her about $137 a month and,

if it did not get this reduction, it would go through bankruptcy and avoid its entire lease. Thus it was left to be inferred by her that Waldorf had the only lease on the property directly from the complainant and her sister. The complainant asked for time to think it over but the respondent restated that the complainant would have to take it, because Waldorf definitely would not pay enough to provide larger payments to her.

Then the respondent represented that Swan Point Cemetery, Inc., holder of the mortgage or mortgages aggregating $21,000 on the Lee Block, had demanded their payment in full; that his wife was ready and able to pay her share of the mortgage; and he asked the complainant to do likewise. To the complainant's inquiry of what would happen if she was unable to pay her share of the mortgage in full, he represented that the mortgagee would foreclose and thereby take over her half of the property. At the trial, however, the evidence showed beyond question that Swan Point Cemetery, Inc. never demanded payment in full of this mortgage at any time and never made such a threat of foreclosure as represented by the respondent.

The complainant still hesitated about accepting the decrease in income and, about this time, the respondent stopped sending to the complainant any monthly income checks. Being disturbed by the representations that Waldorf proposed to reduce its rental, and thereby her income, and by her failure to receive any monthly income checks and by the threat of foreclosure and loss of her interest in the property, as represented by the respondent, she then sought independent legal advice for the first time.

Through her attorney she then discovered that there was recorded against the Lee Block (1) the original lease from Lee to the respondent, dated March 23, 1901; (2) an extension thereof signed by the complainant and dated June 1, 1920; (3) the sublease from the respondent to Waldorf,

dated October 31, 1919, and (4) an extension thereof, dated July 1, 1920. The two last-mentioned subleases were recorded on the same day in August 1920. It appears that this information was a complete surprise to the complainant, who was reluctant to believe it, and that the respondent, when later confronted by complainant's attorney with these and other facts, admitted he had concealed this information from her and asked that she be not informed of the real facts.

The respondent then represented to complainant's attorney that Waldorf was paying him annually *$6100*, although he, as lessor, already had signed a new agreement reducing Waldorf rental from $11,300 to *$7200* annually for five years, beginning May 1, 1933. At the trial the respondent first denied that he had given complainant's attorney any such information. He later admitted, however, when confronted with a paper on which he himself had written "I receive $6100", that his previous testimony on this phase was not in keeping with the facts.

It also was developed at the hearing in the superior court that Swan Point Cemetery, Inc. no longer held the $21,000 mortgage or mortgages on the Lee Block. The respondent in explanation testified in considerable detail and positively that a stranger had purchased a transfer of this mortgage, or mortgages, from Swan Point Cemetery, Inc. As a matter of fact, no stranger had purchased this transfer. When later testimony of the respondent's wife showed beyond question that the respondent had purchased this transfer, after the complainant had objected to accepting smaller monthly income checks, the respondent admitted the truth of these facts, which were wholly inconsistent with his previous testimony in that regard.

There were many other facts and circumstances in evidence which filled in the picture but which we need not repeat here. It should be noted, however, that not all of

the facts, as above stated, are admitted. While many were admitted or at least not disproved, some of the important ones were sharply disputed by the respondent, who gave his own explanation of them.

The determination of the issues, therefore, depended largely upon the credibility of the witnesses and the weight to be given to the testimony and evidence of the complainant and respondent. The superior court justice, who saw and heard both, accepted the version presented by the evidence for the complainant. He accordingly found that the respondent held the legal title to the leases and the extensions thereof, as trustee for the complainant to the extent of her interest in the Lee Block, and thereupon granted the relief prayed for, including an accounting by the respondent, *pro tanto,* from June 19, 1920.

We have repeatedly held that such findings of fact by a justice upon conflicting evidence are entitled to great weight and ordinarily will not be set aside, unless they are shown to be clearly wrong or fail to do justice between the parties. *Kerr* v. *McKenna,* 57 R. I. 252.

The respondent concedes this but contends, chiefly, that (1) the evidence does not establish fraud, actual or constructive, in the making of the lease from Thomas A. Lee to the respondent, dated March 23, 1901, and, (2) that the mere existence of a fiduciary relationship, if established, does not of itself create a trust relationship in the proper sense.

The principal difficulty with the latter of these contentions is that it ignores certain of the determinative facts and evidence. Certainly, upon the view of the evidence taken by the trial justice, there can be little doubt of the correctness of his decision regarding the extension of the lease, procured by the respondent in June 1920. Before us his counsel frankly admitted the existence of a fiduciary relationship and also that the respondent did not inform

the complainant of his original lease, his sublease or extension thereof, or the agreement to reduce Waldorf's rental. If these facts were not admitted, the evidence amply proved them. It also disclosed, if believed, a misrepresentation by the respondent of material facts in order to overreach the complainant, at least in connection with the extension of the lease, to obtain an advantage for himself.

In our opinion, the evidence clearly supports the finding of the trial justice. Under all the authorities submitted by the respondent, such a state of facts justifies the finding that the respondent held the extension of his lease and of the sublease to the Waldorf as trustee in favor of the complainant to the extent of her interest in the Lee Block.

The respondent's other main contention that there was no fraud, actual or constructive, established in connection with the making of the original lease is likewise unsound. It ignores certain determinative facts and seeks to isolate this issue, so as to limit its determination solely to the testimony of the respondent and to the mere making of the lease. The trial justice evidently considered that he was not so limited but based his findings on a consideration of all the evidence and circumstances, as a whole picture, and the legitimate inferences to be drawn therefrom. We think he was correct in so doing.

It is true that the evidence relating to the making of the original lease is not so overwhelmingly clear as is the case regarding its later extension; and also that some of the respondent's testimony, if accepted, would tend to disprove any fraud. Nevertheless, under the circumstances, the trial justice was not bound to believe the respondent's rather general, sketchy and uncorroborated testimony in this particular. The weight which might ordinarily be given to such testimony was greatly diminished, if not wholly destroyed, by other evidence, which included conduct of the respondent entirely inconsistent with his claim,

as well as his lack of complete candor in certain important details during the hearing in the superior court. If we view the evidence as the trial justice apparently did, there is little, if anything, remaining in the record to support the claim that his relation to the complainant and to Lee under the original lease was solely that of lessee. On the contrary, there is evidence which, if not sufficient to constitute an equitable estoppel, preventing the respondent from setting up his claim of interest in the lease, is at least ample to support the conclusion that the original lease came into existence because of a fiduciary relationship between Lee and the respondent, under circumstances which impressed it with a constructive trust; and that the respondent's breach of that trust for his own benefit did not occur until sometime after Lee's death and definitely did occur on October 31, 1919, when the respondent subleased to Waldorf.

The evidence clearly establishes, in fact it is now admitted, that there was a fiduciary relation, dating from Lee's death in 1915, between the respondent and the complainant; and that the respondent concealed from her, for a period of sixteen years thereafter, the important matter of the original lease of the Lee Block obtained by him from her father on March 23, 1901. The trial justice was warranted in finding that the extension of this lease was obtained by the respondent on June 19, 1920 through such concealment, along with other material misrepresentations by him. There is no evidence that the complainant knew of this lease or that the respondent believed that he was concealing from her only a fact which she otherwise knew.

By thus concealing his leasehold interest from her for so long a period, during which the complainant continued to be in ignorance thereof, he deprived her of any opportunity to investigate the circumstances surrounding the making of the original lease, and the relations of the respondent with Thomas A. Lee, during his lifetime, under that lease.

Such an investigation, if made shortly after Thomas A. Lee's death in 1915, might have enabled the complainant to prove from his papers, which presumably came into the possession of the respondent as executor of his will, that a trust in the lease was established for her benefit and that the respondent for seven or eight years had really been acting as a trustee under the lease, rather than as a lessee in his own right.

It has been held, under circumstances which closely resemble in principle those presented in the instant case, that when a person has concealed his adversary legal interest in any property from another to whom he stands in a fiduciary relation and to whom it was his equitable duty to disclose that interest, and when he thereby has caused that other to suffer a substantial detrimental change of position, such fiduciary is prevented by equitable estoppel from setting up or taking advantage of his own interest against that other person. See *Leand* v. *Clark, Childs & Co.*, 53 R. I. 479, 167 A. 122. 2 Pomeroy on Eq. Juris., § 902, p. 1875; 3 *id.* § 1077, pp. 2473, 2474. 2 Pomeroy on Eq. Juris., (4th ed.) § § 805, 807, 901. Bigelow on Estoppel, (6th ed.) 650, 694. *Allen* v. *Goodnow,* 71 Me. 420; *Voorhees* v. *Olmstead,* 66 N. Y. 113, and cases cited.

However, if this doctrine and the above authorities are not, for any reason, applicable to the instant case, we are of the opinion that such evidence and conduct certainly provide strong and convincing evidence, along with other facts appearing in the record, to establish a chain of circumstances relating back to the making of the lease, from which the inference that there was a constructive trust at the inception thereof is hard to avoid.

There was evidence that Thomas A. Lee trusted the respondent, had confidence in his business ability and relied upon him to manage the Lee Block for the benefit of the Lee children; and that the respondent knew of and appreciated

the existence of such confidence and trust. Considered with the other evidence, it was reasonable to infer that there was a fiduciary relation between respondent and complainant from 1915 and also between him and Thomas A. Lee in 1901, when the original lease was executed.

. In addition, there were many things regarding the lease and other incidents which are unusual and are not convincingly explained by the respondent in the record, such as: the making of the lease in 1901, seven years before an existing lease would expire in 1908; Lee's failure to deliver or to record it for at least seven years after its execution; the provisions therein fixing, in 1901, a rental of $4550 to remain constant for twenty-five years from 1908, although the respondent's subleases to Waldorf provided increases in rental every five to ten years; the failure of respondent, a successful and experienced businessman, to produce checks, stubs, accounts or other vouchers which would reveal his real relation to Lee in respect to this lease, or to corroborate his claim that he was a *bona fide* lessee, although he was able to produce other vouchers to support his other claims; the secrecy with which he surrounded the making and existence of this lease; his concealment of his interest from the complainant and its effect upon the position of the complainant; his lack of candor at the trial, and the other evidence of the respondent's conduct, which was wholly inconsistent with his testimony and claim at the hearing.

We are of the opinion, from a consideration of these matters in connection with all the other determinative facts and the respondent's conduct, that there is ample support for the conclusion that the original lease came into existence because of the fiduciary relation between Thomas A. Lee and the respondent; and also that it was executed by Lee and received by the respondent under circumstances which, by operation of law, impressed it with the character of a constructive trust, although there was no actual fraud per-

petrated by the respondent at that time; and further, that the duty imposed by law upon the respondent as such trustee was not substantially breached for his own personal benefit during Lee's lifetime, but was definitely so breached on October 31, 1919, when he first subleased to Waldorf. This is apparently the view taken by the complainant in her bill, and the accounting prayed for and allowed from June 1920 is substantially from the above-mentioned date of the breach. It was also the view of the trial justice who said: "It is difficult to resist the conclusion that what Lee actually intended was to make Astle a trustee of the property for the benefit of his three children and that the machinery of a lease was used to carry out this purpose. The contents of his will, executed two years after Astle went into possession under the lease, confirms this view of the real character of the transaction." As we cannot say that the findings of the trial justice were clearly wrong or failed to do substantial justice between the parties, the respondent's contentions are not sustained.

Counsel for complainant has sought to raise other questions which are not here considered. The decree gave her all the relief prayed for which was based on the allegations of the bill and she has not appealed from the decree. However, we find that some of the relief granted in the decree was not prayed for in the bill of complaint and goes beyond the findings of the trial justice, as they appear both in the decree and in his rescript. Having been granted an accounting of all rents and profits from June 19, 1920, we think that substantial justice will be served if the complainant is not permitted, upon the allegations of her bill and the decision of the trial justice, to have the additional relief in the nature of a penalty as prescribed in paragraph five of the decree. To this extent, the decree is erroneous and paragraph five should be stricken therefrom.

Counsel for complainant also moved in this court, after the hearing on the respondent's appeal, for the appointment

of a receiver of the lease and property. Any proceeding for such a receiver would seem to require that the respondent's wife be joined as a necessary party, because she, as cotenant with the complainant, owns a half interest in the Lee Block and in the lease. The bill of complaint did not make her a party, and no effort was made in the superior court to amend or to have her added as a party respondent. We are of the opinion that there are ample provisions in law to protect the rights of all parties in this regard, if found necessary, by proceedings in the superior court. We, therefore, deny without prejudice the complainant's motion for the appointment of a receiver.

The appeal of the respondent is sustained as to the fifth paragraph of the decree appealed from and it is ordered that said fifth paragraph be stricken from the decree; in other respects the appeal is denied, the decree appealed from, as heretofore modified, is affirmed, and the cause is remanded to the superior court for further proceedings.

Moss, J. I concur in the foregoing opinion, with this qualification, that to my mind the strongest and most convincing ground for sustaining the decree of the superior court in its main provisions is that of equitable estoppel, which is set forth in the opinion of the court. In my judgment the evidence in the case clearly proved that the respondent was guilty of actual fraud upon the complainant by concealing from her for so many years his legal leasehold interest in the Lee Block property; and that thereby she was caused to suffer a change of position that was substantially detrimental to her, very possibly to the full extent of the advantage which enured to him from that leasehold interest in her half of the leased property.

It is well settled that the detrimental change of position by a person, which is necessary to bring into operation, for his benefit, the doctrine of equitable estoppel, may consist of his refraining from taking action which might have prevented loss to him and which he probably would have taken

but for the fraud of the person estopped; and it is also well settled that the statute of frauds does not interfere with the application of this doctrine of equitable estoppel to interests in real estate. See cases cited in the opinion of the court.

Therefore, in my judgment the respondent was, under that doctrine, clearly estopped to set up against the complainant, in this case, his original leasehold interest; and, by his fraud in procuring the extension lease, he was clearly precluded from setting up against her any interest under that lease. The result, for the purposes of this case, would be equivalent to holding him to be constructive trustee, for the benefit of the complainant, of one-half of each of these leasehold interests.

*George Hurley, Walter V. Moriarty, Edward L. Leahy,* for complainant.

*Grim & Littlefield,* for respondent.